# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

February 20, 2013

No. 12-40056

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

ISRAEL PEREZ-SOLIS,

Defendant - Appellant

Appeal from the United States District Court
for the Southern District of Texas

Before HIGGINBOTHAM, SMITH, and ELROD, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Rene Martinez and Israel Perez-Solis ("Perez") were charged with possession with intent to distribute fifty grams or more of methamphetamine and conspiracy to do the same.[1] Perez pleaded not guilty and requested a jury trial. Following his conviction on both counts, the district court sentenced him to 292 months of imprisonment.[2] We AFFIRM the judgment of sentence and conviction.

---

[1] 18 U.S.C. § 2; 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 846 (conspiracy).

[2] Perez received a 292 month sentence on each count, to be served concurrently. The court also sentenced him to a five-year term of supervised release on each count, to be served concurrently, as well as payment of a $200 assessment and $5,000 fine.

**I.**

This case arises out of a drug transaction conducted on May 23, 2011. On May 10, undercover agent Jose Lopez was introduced to Rene Martinez. Lopez told Martinez that he sought to purchase four pounds of methamphetamine. Around May 20, at The Golden Corral restaurant in Laredo, Texas, Martinez provided Lopez with several methamphetamine samples supplied by Martinez's "cousin." Martinez informed Lopez that the four pounds of methamphetamine were in Mexico, but that they would be smuggled into the United States and, on May 23, delivered to Lopez. The delivery was to take place in a parking lot near The Golden Corral, for a price of $13,000 per pound.

On May 23, Martinez arrived at the parking lot in a black truck. He informed Lopez that a friend had the methamphetamine in a white van and instructed that person to drive over to them. Lopez saw the van and directed it into a parking spot across from where Martinez was stopped. Martinez and Lopez walked over to the van. Lopez then met the driver—appellant Israel Perez-Solis—whom Lopez had not previously seen or suspected of involvement.

Lopez secretly recorded his conversation with Perez and Martinez. At trial, Lopez testified that the conversation went as follows: Lopez asked Perez whether he had "it," referring to the methamphetamine. Perez said "we need[] to go somewhere else to take it out" because it was in "a compartment." After Lopez asked where "it" was, Perez stepped out of the van and walked to its trunk. Perez opened the van's back doors to reveal a blue ice chest, and, according to Lopez, "pointed to the drugs being in the ice chest." Martinez asked whether the transaction could be completed in Lopez's nearby hotel room, a question Lopez ignored. When Lopez asked Perez "where exactly it was," Perez told Lopez that the lining of the ice chest needed to be removed and helped him to remove it. Perez did not look surprised when he removed the lining from the cooler. After doing so, Lopez further testified, Perez took out two packages of methamphetamine, told Lopez that the remaining two packages were on the

2

other side of the liner, and handed a package to Lopez. At Lopez's signal, Drug Enforcement Administration (DEA) agents arrested both Perez and Martinez.

An audio recording of the conversation was also admitted in evidence. The prosecution played the recording for the jury (in Spanish), accompanied by a written translation. According to the transcript, Perez told Lopez, "I have it hidden. Where can we take to open it?" And when Lopez later asked, "Will you take [it] out[?] . . . [C]an I see all four (4)?," Perez told him, "[i]t's all here. There's one . . . [a]nd the other one is over here." Lopez acknowledged on cross-examination that—as the transcript indicates—he "never told [Perez] you have the methamphetamine" and "never asked him do you have the drugs," instead using only the word "it." Lopez further acknowledged that Perez used the word "it" rather than "methamphetamine" or drugs; that Perez never said the phrase "in the lining;" and that although Perez said "it" was hidden, he did not say "hidden compartment"—Perez "could have [meant] that the cooler itself was hidden in the truck."

DEA agent Patrick Curran testified next. He explained that on May 23, Martinez's black truck drove in and out of a parking lot several times, as though the driver were attempting to determine whether he was being observed. At some point Perez's white van appeared to be "traveling in tandem with the [truck]. I mean, the van was very close to his rear bumper. They followed the same route through the parking lot before the truck had left." Curran does not appear to have testified, however, that the white van drove in and out of the lot several times. He also acknowledged on cross-examination that although he observed the transaction between Lopez and Martinez on May 20, he did not see Perez on that day.

DEA group supervisor Gilberto Hinojosa followed Curran on the stand. Hinojosa interviewed Perez on May 23. Perez claimed that a neighbor-acquaintance, whom he had known for many years but could not name, asked him to come from Mexico to Texas, pick up a cooler, and deliver that cooler to

someone in exchange for $300.[3] Perez said he received a series of phone numbers, which he called for further instruction. Hinojosa felt Perez had "pretended" to be unable to remember the name of the street from which he received the cooler. And he described Perez's story as coming "in layers. [I]nitially he denied knowing anything about it. Then when I brought it to his attention how ridiculous a story that was, then he would add a little bit more and add a bit. Ultimately, the story was – because I asked him." Finally, Perez disclosed that the methamphetamine likely belonged to Hector Alaniz.

Cross examination focused almost entirely on two facts. First, although Hinojosa supervised the investigation, he was unaware of Perez's involvement until the day of the bust. Second, Perez did not admit to knowledge of the drugs prior to the bust, or to participation in other drug activity. Redirect established that total surveillance between May 10 and 23 lasted only about four to eight hours, and that Perez could have met Martinez without Hinojosa's knowledge.

After Perez moved unsuccessfully for a directed verdict, he took the stand. Perez testified that he owned an electronics-related business in each of Nuevo Laredo, Mexico, and Laredo, Texas. The conversation turned to Hector Alaniz. Perez testified that he had known Alaniz for roughly seven months. Initially, Alaniz was simply a patron of Perez's business. At one point, he brought to Perez's store a "compadre" of his who lived near Perez's father's home. (Alaniz's "compadre" was Perez's father's "neighbor.")

Perez's relationship with Alaniz turned friendlier. They occasionally had lunch together, for which Alaniz would offer to pay. Once Alaniz realized that Perez was living in Laredo, Perez testified, "he started asking me a lot of favors." The favors were essentially errands: purchasing a computer from Best Buy (for which he was reimbursed and paid sixty or seventy dollars); a "Super Chip" from Pep Boys; a toolbox for Perez's truck, etc. Each purchase was made at a well-

---

[3] Perez was to pay fifty dollars to the person with the cooler.

known establishment, always with Perez's credit card. Alaniz compensated Perez for his efforts, reimbursing him for expenses and adding "whatever [Alaniz] thought was fair."

The final favor that Perez did for Alaniz before the bust involved retrieving some documents from Roma, Texas. Perez retrieved the documents on May 9, but was not compensated at that time.[4] Including reimbursement, Perez expected to receive $200–$250 for the errand. On May 23, the day of the bust, the "neighbor" came to his shop and informed him that Alaniz would pay him in Laredo, Texas, for the Roma favor.

Later that day, while driving to Laredo, Perez called the "neighbor" to ask where he should go to be paid. The "neighbor" told Perez that he had given Perez's number to someone, who would call him. A person named Demetrio called and said that his "cousin" would pay Perez at a warehouse near Mines Road. That "cousin"—whom Perez later learned was Rene Martinez—gave Perez another phone number, which apparently belonged to a "Night Watch[man]." At some point Perez spoke with Alaniz to inquire about who would be paying him. Alaniz informed Perez that he should give the night watchman fifty dollars for an item to be delivered to Martinez. Perez paid the watchman fifty dollars for an "ice chest" and called Martinez, who instructed him to go to The Golden Corral.

Perez testified that he arrived at the Corral before Martinez and did not follow Martinez's vehicle. A man wearing a blue shirt signaled to Perez and indicated where Perez should park. When the man—evidently Lopez—asked Perez whether he had anything for Lopez, Perez informed him that the ice chest was in the back of Perez's van. Perez testified that he did not open the cooler and implied that he did not remove the methamphetamine from the cooler. He was surprised, he added, to see the hidden contents of the cooler.

---

[4] On May 10, Perez also brought to Texas the vehicle to which the documents related.

Perez called two other witnesses, but at the close of trial, he did not renew his motion for a judgment of acquittal. On appeal, Perez challenges the sufficiency of the evidence supporting each count of conviction; disputes evidentiary rulings surrounding the prosecution's cross-examination of Perez; argues there was a material variance between the indictment and the evidence proffered at trial; claims the prosecutor committed misconduct during closing argument; and contests the district court's application of the Sentencing Guidelines. We consider each argument in turn.

## II. Sufficiency of the Evidence

Perez first argues that insufficient evidence supports each of his convictions. Because he did not renew his motion for a judgment of acquittal, he forfeited his challenge to these alleged errors.[5] We may nevertheless correct a plain error that affects substantial rights, and will do so if the error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings."[6] For evidence to be plainly insufficient, the record must be "devoid of evidence pointing to guilt" or the evidence "so tenuous that a conviction is shocking."[7] We "view[] 'the evidence in the light most favorable to the government, [and] draw[] all reasonable inferences and credibility choices . . . in support of the verdict.'"[8]

### A. Conspiracy

---

[5] *United States v. Dowl*, 619 F.3d 494, 500 (5th Cir. 2010) (citing *United States v. Burton*, 324 F.3d 768, 770 (5th Cir. 2003)).

[6] *United States v. Olano*, 507 U.S. 725, 736 (1993) (quoting *United States v. Atkinson*, 297 U.S. 157, 160 (1936)).

[7] *United States v. Delgado*, 672 F.3d 320, 331 (5th Cir.) (en banc) (emphasis removed) (quoting *United States v. Phillips*, 477 F.3d 215, 219 (5th Cir. 2007)) (internal quotation marks omitted), *cert. denied*, 133 S. Ct. 525 (2012).

[8] *Id.* at 332 (quoting *United States v. Ortega Reyna*, 148 F.3d 540, 543 (5th Cir. 1998)).

Perez's conspiracy conviction required proof, beyond a reasonable doubt, of the existence of an agreement to possess fifty grams or more of methamphetamine with the intent to distribute it, as well as Perez's knowledge of and voluntary participation in that agreement.[9] A "jury may infer a conspiracy agreement from circumstantial evidence, and may rely upon presence and association, along with other evidence, in finding that a conspiracy existed."[10]

Perez's argument focuses on whether evidence demonstrates that he had knowledge of *Martinez's* agreement with others.[11] It centers on two propositions. First, the government was unaware of Perez's involvement with Martinez until the day of their arrest. Second, Perez was not aware he was transporting methamphetamine.

The record provides a simple explanation for why the government was unaware of Perez's involvement: surveillance was limited. DEA group supervisor Hinojosa testified that surveillance prior to May 23 lasted only about four to eight hours, and that Perez could have communicated with Martinez without Hinojosa's knowledge. Moreover, agent Curran testified that Perez's white van appeared to be "traveling in tandem with [Martinez's black truck]." This suggests collaboration and cooperation. Moreover, Perez admitted that he spoke to Martinez on the phone on May 23, though he contended that their conversation was innocuous. And as agent Lopez testified, Perez waited at the ready for Martinez to summon him to The Golden Corral.

The second proposition also lacks force. Perez suggests that agent Lopez misunderstood the word "it," interpreting it to refer to methamphetamine rather

---

[9] *See United States v. Valdez*, 453 F.3d 252, 256–57 (5th Cir. 2006); *United States v. Fierro*, 38 F.3d 761, 768 (5th Cir. 1994).

[10] *United States v. Robles-Pantoja*, 887 F.2d 1250, 1254 (5th Cir. 1989) (citations omitted).

[11] Perez stipulated that "the substance found in the wrapped bundles in the cooler was methamphetamine and in excess of 500 grams and 97 percent purity."

than the cooler or the drinks contained therein. We are not convinced. First, the transcript makes clear that Perez said "and the other one is over here." If Perez was discussing beverages plainly visible inside the cooler, there would be no need to say "and the other one is over here." Instead, the phrase suggests that Perez was referring to methamphetamine hidden in another portion of the cooler's lining, even if he never said the word "liner." Second, Perez's question, transcribed as "[w]here can we take to open it[?]," suggests that he knew he was not talking merely about a cooler containing legal beverages. The idea that the cooler could not be opened in a parking lot suggests a fear that its illegal contents would be observed. Third and finally, even if the audio recording is ambiguous, translation of the *audio* recording has no bearing on Lopez's testimony about what he *saw*. Lopez testified that Perez did not look surprised when the lining of the cooler was removed, and testified that Perez showed him how to access the drugs. Even putting aside whether Perez's testimony is so implausible as to itself be incriminating, in the light most favorable to the verdict, this evidence establishes far more than Perez's mere "association with the conspirators, and his presence at the time of the transactions."[12] There is no error here, plain or otherwise.

### B. Possession

Perez's possession conviction required proof, beyond a reasonable doubt, that he knowingly possessed fifty grams or more of methamphetamine and intended to distribute it.[13] Perez argues that there was insufficient evidence to establish that he knew he was delivering drugs, but a reasonable jury could have concluded otherwise. The government presented evidence that Perez indicated

---

[12] *United States v. Maltos*, 985 F.2d 743, 747 (5th Cir. 1992).

[13] *See United States v. Olguin*, 643 F.3d 384, 394 (5th Cir.), *cert. denied*, 132 S. Ct. 432, *and cert. denied*, 132 S. Ct. 439 (2011).

that "it" was in the cooler. Perez suggested that they open the cooler elsewhere, indicating that he wanted to keep its contents secret. He showed no surprise when drugs were removed from the lining of the cooler. These facts and others provide sufficient evidence from which a reasonable jury could infer knowledge.

### III. Cross Examination

Perez next argues that the district court erred by permitting the prosecutor to cross-examine Perez "with financial data." We review preserved evidentiary objections for abuse of discretion, but will not reverse a conviction because of a harmless error.[14] We review forfeited objections only for plain error.[15]

On direct examination, Perez's counsel asked several questions pertinent here. Regarding Perez's business in the U.S., counsel inquired:

Q[:] Israel, tell me, what do you do for a living?

A[:] I have a business in Nuevo Laredo approximately for the last 17 years, and another one here in Laredo, Texas.

Q[:] And what type of a business is this?

A[:] I repair, I sell, and I install electronic systems or equipment; fix stereos, alarms, lights, communication equipment for vehicles.

\* \* \*

Q[:] Do you report your income tax returns here in the U.S.?

A[:] That is correct.

Direct examination also addressed paid favors that Perez did for Alaniz. And Perez's counsel stated, "You're being truthful today, Mr. Perez." To which Perez replied, "That's right."

On cross-examination, the prosecutor drew attention to several pieces of financial information. For example:

---

[14] *United States v. Hicks*, 389 F.3d 514, 522 (5th Cir. 2004) (citation omitted).

[15] *United States v. Thompson*, 454 F.3d 459, 464 (5th Cir. 2006) (citation omitted).

Q[:] About how much money did you make in the business in America in 2010?

A[:] Twenty-five thousand dollars.

* * *

Q[:] And was it exactly 25 thousand; zero, zero, zero dollars and zero cents?

A[:] That's right.

* * *

Q[:] And did you list any business expenses of your business in 2010 on the tax return?

A[:] No.

* * *

Q[:] Are you aware that your 2009 tax return was also found in your car?

A[:] That's right.

Q[:] And in that, are you aware that in your business income you listed exactly 14 thousand, zero, zero, zero as your income?

A[:] Well, yes; well, I don't remember exactly, but that sounds about like it's in that average.

The prosecutor also inquired about certain checks that Perez had written. For example:

Q[:] And that check references a payment to yourself of $7,000?

A[:] That's right.

Q[:] Exactly 7,000?

A[:] Yes.

Q[:] And do you know what date you wrote that check?

A[:] Not exactly, but it hadn't been long before [the arrest].

Q[:] May, 2011, sometime?

A[:] Yes; it hadn't been long before.

The prosecutor also elicited testimony that Perez worked seven days a week and had about twenty to thirty clients daily.

The district court admitted in evidence checks, bank deposit slips, and tax returns. Perez does not object to the admission of these documents. He instead contends that the cross-examination set out above was improper because it exceeded the scope of direct examination; it addressed irrelevant issues; its substantial risk of prejudice outweighed its probative value; and it impermissibly focused on specific instances of character. Perez preserved his relevance and scope objections, prompting review for abuse of discretion. The latter two arguments appear subject to plain error review, but fail regardless.

## A. Scope of cross-examination: Rule 611

Rule 611(b) provides that "[c]ross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness. The court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination."[16] "Implicit in the rule is that all evidence relevant to the subject matter of direct examination is within the scope of cross-examination" and is therefore "admissible" unless otherwise excluded.[17] An inquiry about an action is not outside the scope of cross merely because that action was not discussed on direct examination.[18]

Perez contends that he did not testify about his finances on direct examination. This, he suggests, means that cross-examination exceeded the

---

[16] FED. R. EVID. 611(b) (2011).

[17] *United States v. Beechum*, 582 F.2d 898, 907 (5th Cir. 1978) (en banc) (citation omitted). Perez refers to his Fifth Amendment right to avoid self-incrimination. The scope of a Fifth-Amendment waiver should not be determined by the scope of permissible cross-examination; Rule 611(b) expressly authorizes the district court to "permit inquiry into additional matters as if on direct examination." *Id.* (quoting FED. R. EVID. 611(b)). But "[t]he defendant . . . is deemed to waive the privilege, at least with respect to matters about which he testifies." *Id.* at 908. Otherwise, the defendant could "testify with impunity on matters he chooses and in a manner he chooses,"—"a 'positive invitation to mutilate the truth a party offers to tell.'" *Id.* (quoting *Brown v. United States*, 345 U.S. 148, 156 (1958)).

[18] *See id.*

scope of direct examination. We disagree. On direct examination, Perez testified that he had a legitimate business for which he filed income taxes. He further testified that he had previously run errands for Mr. Alaniz, and that he inadvertently transported methamphetamine in an attempt to collect an estimated $250 owed to him for a previous errand. The tax returns to which the government referred are pertinent to Perez's supposed business; he portrayed himself as a legitimate business person on direct, and the returns cast doubt on that testimony. Likewise, evidence that Perez had access to and transferred large amounts of cash casts doubt on the purported rationale for his circuitous trip—an attempt to recover $250. This objection lacks force.

### B. Relevance: Rule 401

Rule 401 deems relevant all evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[19] Under Rule 402, such evidence is admissible unless otherwise provided by federal statutory or constitutional law, the Federal Rules of Evidence, or "other rules prescribed by the Supreme Court pursuant to statutory authority."[20]

Perez contends that the financial documents at issue were irrelevant because he was not charged with financial misfeasance. The argument fails for essentially the reasons that cross-examination did not exceed the scope of direct examination. These documents were relevant to impeach Perez's testimony and to cast doubt on his claims of running an honest business.

### C. Prejudice and probativeness: Rule 403

---

[19] FED. R. EVID. 401 (2011).

[20] FED. R. EVID. 402 (2011).

Rule 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is *substantially* outweighed by the danger of *unfair* prejudice."[21] Unfair prejudice "speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged"—the ground need not be emotional in nature.[22] Probative value "may be calculated by comparing evidentiary alternatives."[23]

Perez argues that the prosecution only needed the financial documents so it could "present an alternative theory of financially-oriented narcotics activity." That is not so. The government needed the documents to impeach Perez's testimony, and Perez suggests no other way in which the government could have done so as effectively.[24] Thus, even if there was a risk of unfair prejudice, it was not an abuse of discretion or plain error to conclude that the risk of unfair prejudice did not substantially outweigh the probative value of the evidence.

### D. Specific instances of character: Rule 608

Perez finally relies on Rule 608(b), which provides, in pertinent part:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' character for truthfulness other than conviction of a crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness's character for truthfulness or untruthfulness . . . . The giving of testimony, whether by an accused or by any other witness, does not operate as a waiver of the accused's or the witness'

---

[21] FED. R. EVID. 403 (2011) (emphasis added).

[22] *Old Chief v. United States*, 519 U.S. 172, 180 (1997).

[23] *Id.* at 184; *see also id.* at 186, 187.

[24] *Cf. id.* at 174–76 (defendant charged with being a felon in possession stipulated that he was a felon, sought to exclude evidence concerning prior offense).

privilege against self-incrimination when examined with respect to matters that related only to character for truthfulness.[25]

Perez argues that cross-examination about "ordinary tax returns, deposit slips, and bank statements" was an improper attack on his character. We disagree. The financial documents were not aimed at establishing that Perez *is the type of person who lies*. Instead, they go to whether the testimony that Perez provided was itself untruthful. There is no error here.

### IV. Material Variance

We review a forfeited claim of material variance for plain error.[26] "A variance arises when the proof at trial depicts a scenario that differs materially from the scenario charged in the indictment but does not modify an essential element of the charged offense."[27] "A variance is material if it prejudices the defendant's 'substantial rights,' either by surprising the defendant at trial or by placing the defendant at risk of double jeopardy."[28]

Perez's indictment contained two counts. The first charged that Martinez and Perez "did knowingly and intentionally conspire and agree with each other and with other persons known and unknown to the Grand Jurors to possess with intent to distribute . . . [fifty] grams or more of methamphetamine." The second charged that they "did knowingly and intentionally possess with intent to distribute . . . [fifty] grams or more of methamphetamine."

Perez points out that the indictment does not "mention . . . any form of financial misfeasance" and complains that the government "present[ed] an alternative theory of conviction whereby the jury could convict him if it believed

---

[25] FED. R. EVID. 608(b) (2011).

[26] *United States v. McCullough*, 631 F.3d 783, 793 (5th Cir. 2011).

[27] *United States v. Delgado*, 401 F.3d 290, 295 (5th Cir. 2005) (citations omitted).

[28] *United States v. Robinson*, 974 F.2d 575, 578 (5th Cir. 1992) (citations omitted).

he was involved in the North Mexico/South Texas drug trade generally." To support this claim, he cites this excerpt of the prosecutor's closing:

> [I]t's all circumstantial evidence. But take a look at his tax returns. He's self employed, ladies and gentlemen, and his tax return in 2010 shows $25,000 even, with no business expenses, 2-5-0-0-0.

This is not a plain variance. Perez testified that he was a legitimate businessperson duped by Alaniz and his associates. The prosecutor's argument that the testimony was not credible—that he was not duped—is not an argument that general involvement in the drug trade is sufficient to convict.[29]

Perez's reliance on *United States v. Adams*[30] is misplaced. Adams purchased a handgun.[31] Doing so required him to fill out a form that requested several pieces of information, including his name and residence.[32] Federal law prohibited presenting false identification in connection with a purchase, and separately prohibited making a false statement in connection with a purchase.[33] The indictment focused on Adams's use of an ID listing his last name as Cole, and on Adams's statement that he was Cole—that is, it focused on his identity.[34] At trial, however, the government's theory of the case was that, in addition to a false name, his ID and statement were also false with respect to his residence.[35] The court's instruction to the jury referenced both the address and the name

---

[29] This is so notwithstanding the fact that the district court admitted certain documents in evidence.

[30] 778 F.2d 1117 (5th Cir. 1985).

[31] *Id.* at 1119.

[32] *Id.*

[33] *Id.* at 1120.

[34] *Id.* at 1118–19.

[35] *Id.* at 1120.

issues.[36] The defendant objected, explaining, "[m]y theory is that a mailing address and identity are two different things. And they're charging him with using a false identity, and might convict him with using a false mailing address."[37] This Court agreed with that concern, found that the indictment had been constructively amended, and reversed.[38]

By contrast, here, the government did not argue to the jury a separate crime not charged in the indictment, and the court's instructions did not suggest that the jury could convict on such a ground. In any event, unlike the *Adams* constructive amendment (then subject to automatic reversal), even a preserved objection to an alleged variance is immaterial without prejudice. On plain-error review, the burden of demonstrating prejudice falls to the defendant, who has not satisfied it here.[39]

## V. Prosecutorial Misconduct

Perez contends that four portions of the government's closing argument constitute prosecutorial misconduct that, either individually or cumulatively, warrant reversal even under plain-error review. Had Perez contemporaneously objected, we would first determine whether the prosecutor's remarks were improper and then assess "whether they prejudicially affected the substantive

---

[36] *Id.* at 1122.

[37] *Id.*

[38] *Id.* at 1124–25.

[39] *See Olano*, 507 U.S. at 734. There is no contention that a material variance is an error for which prejudice need not be shown.

rights of the defendant."[40] Because he forfeited the objections, we review only for plain error.[41]

A–B. Financial documents and "incredible coincidences"

Perez's first two arguments stem from a four-paragraph excerpt of the prosecutor's closing argument. The prosecutor stated:

> I submit to you that if you believe his story then let him go. If you really believe that, if you really believe this story, let him go. But you don't have to believe that story . . . and I submit to you that you should not believe it and here's some reasons why you should not believe what he tells you.
>
> First of all, there's—it's all circumstantial evidence. But take a look at his tax returns. He's self employed, ladies and gentlemen, and his tax return in 2010 shows $25,000 even, with no business expenses, 2-5-0-0-0.
>
> Now if you're salaried and you work for somebody else you might reasonably have a salary of $25,000 but it would be an incredible coincidence if you have 15 to 20 customers a day and on typical transactions your profit is [$]15 to $20 or your labor cost is [$]15 to $20, plus the cost of stereo equipment, that it would just all add up at the end of 2010 exactly 25,000. But that's what he told you.
>
> And if you'll down on the Schedule C in the 2009 one, it turns out to be exactly 14,000. 14,000 even. It's unbelievable two years that that happened for a self-employed man.

Perez contends that the prosecutor treated the financial documents as substantive evidence of guilt, rather than impeachment evidence, and "made himself an unsworn witness about 'incredible coincidences.'" We disagree.

---

[40] *United States v. Fields*, 72 F.3d 1200, 1207 (5th Cir. 1996) (citations omitted). The latter inquiry turns on "[1] the magnitude of the prejudicial effect of the statements," which is "tested by looking at the prosecutor's remarks in the context of the trial in which they were made and attempting to elucidate their intended effect;" "[2] the efficacy of any cautionary instruction given; and [3] the strength of the evidence of the defendant's guilt." *Id.*

[41] *United States v. Brown*, 887 F.2d 537, 542 (5th Cir. 1989) (citation omitted).

The first argument lacks force. Perez's testimony suggested his innocence. The documents suggested that the testimony was untruthful. Thus, the documents provided some evidence of Perez's guilt. Even if the prosecutor committed plain misconduct, we perceive no effect on Perez's substantial rights. The prosecutor could have said "these documents suggest that Perez's exculpatory testimony was false." Perez has not demonstrated that instead using the phrase "circumstantial evidence" was prejudicial.[42]

The second argument complains that since no witness testified that round numbers on tax returns suggest criminality, the prosecutor needed to testify to make his argument—and effectively did so by saying "I." The challenged excerpt does not say "I think that" or "I believe." It says "I submit to you"—which a prosecutor making an argument from evidence necessarily does.[43] The statement was mere argument—not misconduct—encouraging a common-sense inference from the record.[44] In any event, we see no prejudice here.

### C. Burden shifting

Perez's third argument focuses on a portion of the following statement by the prosecutor:

> [The idea that there is no conspiracy] doesn't really make any sense if you look at it from any other angle either because the other view would be – because how would it that all those people except our defendant know that? So that's what you have to think about.

---

[42] There is no suggestion that this sort of statement, if error, would be an error for which no prejudice need be shown.

[43] *Cf. United States v. Morris*, 568 F.2d 396, 402 (5th Cir. 1978) ("[A]n attorney may properly state, 'I believe that the evidence has shown the defendant's guilt.'" (citation omitted)); *cf. also id.* at 400 n.1.

[44] *See United States v. McCann*, 613 F.3d 486, 495 (5th Cir. 2010) ("The test for improper vouching for the credibility of a witness is 'whether the prosecutor's expression might reasonably lead the jury to believe that there is other evidence, unknown or unavailable to the jury, on which the prosecutor was convinced of the accused's guilt.'" (citation omitted)).

> So when we're talking about what did the defendant know, you know, the government doesn't have a brain scan of the defendant. That's impossible. That doesn't – that wouldn't tell us and he has no MRI. So the only way you can determine if this defendant, ladies and gentlemen, knew about the methamphetamine in the cooler is to look at all the other facts and circumstances and use your commonsense because that at the end of the day is all that can be done in a criminal trial like this.

Perez contends that the prosecutor "clearly intended to burden shift by stating that . . . Perez[] 'has no MRI' rather than stating that the Government failed to produce such evidence." We view the prosecutor's comment differently. First, the comment amounts to a statement that *there is no* MRI: the prosecutor did not simply say "he has no MRI," he also stated that "the government doesn't have a brain scan of the defendant." The clear import of his statements is that the jury would need to make its determination based on "all the other facts and circumstances and use [its] commonsense." Second, the prosecutor did not fault the defendant for failing to produce an MRI; in the quoted excerpt, the prosecutor acknowledges that a brain scan "wouldn't tell us anything"—suggesting that any MRI would be unimportant.

Finally, proof of an effect on Perez's substantial rights is again absent. This is especially so because not only did the district court repeatedly instruct the jury that the government must prove its case beyond a reasonable doubt, it also pointed out that "the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence."

### D. Improper request for larger social message

Finally, Perez complains that the prosecutor asked the jury to send a larger social message. The object of his ire is this statement:

> By the way, this person is also sophisticated about what in the world is going on in our community. He indicated yes, he knows there's a drug trade. He has read the news. He sees it on TV. He crosses the bridge all the time. The dogs have actually been in his

vehicle before searching his car. He's well aware that this is a big
deal in Laredo, Texas and Nuevo Laredo, Tamaulipas.

Perez concedes that "prosecutorial appeals for the jury to act as the 'conscience

of the community' are not impermissible when they are not intended to inflame."

He contends, however, that "these statements by the [p]rosecutor were clearly

'intended to inflame' since the jury was asked not to serve as a mere 'community

conscience' but rather to end 'the drug trade' in 'our community' as defined by

the shared social links between 'Laredo, Texas and Nuevo Laredo, Tamaulipas.'"

This argument is without merit. The clear import of the prosecutor's

argument is that Perez knew of drug trafficking in Laredo, but purported to have

no suspicion of drug activity when led by a series of mysterious callers to the side

of a road to pay a watchman fifty dollars for a cooler. There is no misconduct

here.[45] And even considered cumulatively, any misconduct was not prejudicial.

## VI. Sentencing

Perez raises two challenges to his sentence. First, he argues that the

district court erred by applying the U.S.S.G. § 3C1.1 obstruction-of-justice

enhancement. Second, he argues that the court erred by rejecting his request for

a § 3B1.2 minor-participant reduction. We review de novo an application of the

Sentencing Guidelines, but review factual findings for clear error.[46] Whether a

defendant was a minor participant is a factual determination.[47] "A factual

---

[45] *See, e.g.*, *United States v. Duffaut*, 314 F.3d 203, 211 (5th Cir. 2002); *United States v. Brown*, 887 F.2d 537, 542 (5th Cir. 1989).

[46] *United States v. Delgado-Martinez*, 564 F.3d 750, 751 (5th Cir. 2009) (citation omitted).

[47] *United States v. Villanueva*, 408 F.3d 193, 203 (5th Cir. 2005) (footnote and citation omitted).

finding is not clearly erroneous if it is plausible in light of the record read as a whole."[48]

### A. Obstruction of justice under § 3C1.1

Section 3C1.1 provides for an increase of two offense levels "[i]f (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the . . . prosecution . . . of the instant offense of conviction, and (2) the obstructive conduct related to . . . the defendant's offense of conviction and any relevant conduct."[49] A defendant impedes or obstructs justice, if only for purposes of this enhancement, when he perjures himself.[50] "A witness testifying under oath or affirmation [commits perjury] if she gives [1] false testimony concerning [2] a material matter with [3] the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory."[51]

Because the fact of a conviction does not imply that a testifying defendant committed perjury, "if a defendant objects to a sentence enhancement resulting from her trial testimony, a district court must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same, under the perjury definition" set out above.[52] "Simply basing the enhancement on the jury's verdict is improper."[53] But while "it is preferable for a district court to address each

---

[48] *Id.* (citation omitted).

[49] U.S.S.G. § 3C1.1.

[50] *United States v. Dunnigan*, 507 U.S. 87, 92–94 (1993) (citation omitted); *see also* U.S.S.G. § 3C1.1 cmt. 4(B).

[51] *Dunnigan*, 507 U.S. at 94; *see also id.* at 94–95.

[52] *Id.* at 95 (citations omitted).

[53] *United States v. Ricardo*, 472 F.3d 277, 285 (5th Cir. 2006) (citations omitted).

element of the alleged perjury in a separate and clear finding," it is enough for the court to "make[] a finding of an obstruction of, or impediment to, justice that encompasses all of the factual predicates for a finding of perjury."[54] The sentencing court need not expressly find that the false testimony concerned a material matter; it is enough that materiality is "obvious[]."[55] Finally, the sentencing court need not make factual findings on its own; it is sufficient for the court to adopt adequate findings in a Presentence Investigation Report (PSR).[56]

Perez objected to the obstruction enhancement. At sentencing, the district court explained his rationale for overruling the objection:

> It is one of the, perhaps, anomalies or strange consequences for a person who maintains their innocence, proceeds to trial, exercises their right to take the stand and to defend themselves of the accusation against them that once they're convicted, after the trier of fact, in this case the jury, rejects their defense and finds the government proved beyond a reasonable doubt the elements of the crime that they stood accused of and went to trial on that you are then faced with the guideline enhancement for obstruction of justice on the basis that when you take the stand and simply deny your—your participation in any illegal activity, in this case narcotic trafficking, a simple denial in my interpretation of the guidelines—in cases of interpreting the guidelines, a simple denial would not justify an adjustment for obstruction of justice.

> In this particular case if the simple denial is accompanied by intricate testimony that doesn't result from confusion, mistake, faulty memory but testimony that the trier of fact hears and rejects, the question then becomes was that testimony a simple denial or was it more to the level of being a willful attempt to obstruct justice or impede the administration of justice.

Although the sentencing judge did not preside over Perez's trial, he reviewed and expressly relied on the PSR's summary of Perez's testimony. The court

---

[54] *Dunnigan*, 507 U.S. at 95.

[55] *United States v. Cabral-Castillo*, 35 F.3d 182, 187 (5th Cir. 1994); *see also United States v. Como*, 53 F.3d 87, 91 (5th Cir. 1995).

[56] *See United States v. Laury*, 985 F.2d 1293, 1309 (5th Cir. 1993).

specifically drew attention to the fact that "the defendant claimed he never knew there was methamphetamine," among other obviously material statements. Because materiality is obvious, the question is whether the district court's findings encompassed the finding that Perez willfully made a false statement.

We hold that they did. The district court adopted the PSR, which explained that "Perez advised [Lopez] that the narcotics were hidden in the back of the van" and claimed that "Perez . . . removed one of the bundles [of methamphetamine] and gave it to [Lopez]." These findings squarely conflict with the testimony described at sentencing; e.g., "the defendant denied ever taking . . . the package from the ice chest" and "[i]t was only when the defendant was at the back of the van and the package was removed that[, according to him,] he realized that the transaction involved methamphetamine." Moreover, the district court acknowledged that falsity stemming from faulty memory, confusion, or mistake is not perjury. And it embraced the Probation Officer's response to Perez's objections to the PSR, which acknowledged the inadequacy of confusion, mistake, and faulty memory, and then disputed the applicability of those descriptions. Consequently, we perceive no error.

## B. Minor participant reduction under § 3B1.2

Section 3B1.2 provides that a defendant's offense level should be reduced by two to four levels if he was a minimal participant (four levels), a minor participant (two levels), or something in between (three levels).[57] The difference between these types of participants is in degree only.[58] Thus, a defendant whose role was too substantial to qualify for a two-level, minor-participant reduction

---

[57] U.S.S.G. § 3B1.2. The defendant has the burden of establishing his role by a preponderance of the evidence. *United States v. Posada-Rios*, 158 F.3d 832, 880 (5th Cir. 1998) (citation omitted).

[58] *United States v. Turincio*, 78 F. App'x 344, 347 (5th Cir. 2003) (per curiam).

is likewise not entitled to the three- or four-level reduction.[59] Accordingly, no reduction is available under § 3B1.2 unless the participant was "peripheral to the advancement of the criminal activity."[60]

"Section 3B1.2 does not contemplate that the participation level is to be evaluated in reference to the entire criminal enterprise of which Defendant is a part."[61] "Instead, [§] 3B1.2 asks whether a defendant's involvement is comparable to that of an 'average participant.'"[62] Whether someone was an "average participant" is to be determined in light of the conduct for which the defendant is held responsible.[63] Thus, the question is whether the district court clearly erred in determining that Perez was not a minor participant in the conspiracy concerning four pounds of methamphetamine.[64]

Perez argues that his "fleeting conduct in picking up a cooler and driving it to the location directed was so attenuated compared to the weeks-long surveillance [of] Martinez" that a reduction was required. That Perez was not observed by DEA agents has little bearing on his role in the conspiracy. Martinez may have been *more* involved than Perez, but that does not establish that Perez was "peripheral to the advancement of the criminal activity" or less culpable than, e.g., Demetrio or the night watchman.

Moreover, the addendum to the PSR, which the district court adopted, found that "[a]lthough it is unclear the exact role the defendant played in this

---

[59] *Id.*

[60] *See United States v. Martinez-Larraga*, 517 F.3d 258, 272 (5th Cir. 2008) (citation omitted).

[61] *United States v. Garcia*, 242 F.3d 593, 598 (5th Cir. 2001) (citation omitted).

[62] *Id.* (quoting *United States v. Buenrostro*, 868 F.2d 135, 138 (5th Cir. 1989)).

[63] *See, e.g.*, *id.* at 598–99; *United States v. Atanda*, 60 F.3d 196, 199 (5th Cir. 1995) (per curiam).

[64] If Perez was not a minor participant in the *conspiracy* to possess with intent to distribute, he was not a minor participant in the possession with intent to distribute count.

offense, it is clear that he picked up the methamphetamine and transported it in a concealed fashion within an ice cooler. This defendant then aided the undercover agent in dismantling the cooler and exposing the narcotic."[65] The methamphetamine that he transported was *all* of the methamphetamine at issue; Perez was not held accountable, for example, for drugs with which he had no personal involvement.[66] Given the facts supporting Perez's conviction, the district court did not clearly err in determining that he was not a minor participant. The cases on which Perez relies are inapposite.[67]

**\* \* \***

Perez transported four pounds of methamphetamine that was secreted within a cooler. A jury reasonably found that he conspired to distribute the drugs, and the government permissibly used financial documents to undermine his alibi. Because he was not a minor participant in the conspiracy and obstructed justice when he testified, we AFFIRM.

---

[65] *Cf. Buenrostro*, 868 F.2d at 138 ("A courier who willingly undertakes illegal transit without asking many questions is especially valuable to a criminal organization.").

[66] *Cf. Garcia*, 242 F.3d at 598–99.

[67] *See United States v. Hunte*, 196 F.3d 687, 694 (7th Cir. 1999) ("Hunte helped hide the groups activities by closing the blinds, and registered for a motel room, but *she was in no sense a courier* nor did she help load or unload the drugs. She provided nothing 'necessary' or 'essential' to the operation." (emphasis added)); *United States v. Neils*, 156 F.3d 382, 384 (2d Cir. 1998) (holding that district court erred in *categorically* determining that someone who played a particular role could not be a minor participant and explaining that a factual determination was necessary); *United States v. Green*, 152 F.3d 1202, 1205–06 (9th Cir. 1998) (holding that district court did not clearly err in *granting* reduction, though it was a close question); *United States v. Durham*, 139 F.3d 1325, 1336 (10th Cir. 1998) (holding that district court did not clearly err in *granting* reduction).