**REVISED MARCH 26, 2014**

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 12-40515

**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**
March 25, 2014

UNITED STATES OF AMERICA,

Lyle W. Cayce
Clerk

Plaintiff - Appellee

v.

KENDRICK TYSHAWN AKINS; RAFAEL CARRAE EDWARDS, also known as
Fel; MARCO DEMON PERKINS; CLOVIS SHANTEZ LIGGINS, also known as
Shantez, also known as Black; DONNELL LESHONE WALTERS, also known
as Scooter; STACY LYNN GAGE; TOMMY DESHONE PERKINS, also known
as Shawn,

Defendants - Appellants

Appeals from the United States District Court
for the Eastern District of Texas

Before HIGGINBOTHAM, OWEN, and HIGGINSON, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Kendrick Tyshawn Akins and six others (collectively, "Appellants") were convicted and sentenced for conspiracy to possess with intent to distribute 5 kilograms or more of cocaine ("powder cocaine"), 50 grams or more of cocaine base ("crack cocaine"), and 1,000 kilograms or more of marijuana, in violation of 21 U.S.C. §§ 841(a), 846. They timely appealed. We affirm.

No. 12-40515

## I. Background

In 2008, the Drug Enforcement Administration ("DEA") began investigating a drug conspiracy involving the movement and sale of drugs, primarily powder and crack cocaine, from Mexico to Dallas, Texas, and then to Paris, Texas, and Hugo, Oklahoma. The investigation relied heavily on approximately 10,000 wiretapped telephone calls, and recordings of many of these calls provided much of the evidence at trial. Agents initially focused on Stacey Williams, suspected to be a large supplier of cocaine in the Dallas area. Williams introduced his Mexico-based supplier Francisco Trujillo to Rafael "Fel" Carrae Edwards, describing Edwards as his cousin from Paris who bought large quantities of powder cocaine. Edwards was arrested on June 16, 2009, at an apartment in Dallas that Edwards shared with his girlfriend. Agents found crack cocaine in the bedroom where Edwards was sleeping, along with a semi-automatic pistol stuffed under the mattress on Edwards' side of the bed. That same day, law enforcement executed another search warrant at Edwards' residence in Desoto, Texas. Officers found ledgers that contained notations related to drug trafficking. The ledgers also contained multiple references to Tommy Deshone "Shawn" Perkins and his best friend Kendrick Tyshawn Akins. Shawn Perkins and co-defendants Marco Perkins and Shantez Liggins are brothers. Their mother lived on Campbell Street in a house that served as a "home base" for the conspiracy in Paris, Texas. Shawn Perkins would take cocaine purchased from Edwards in Dallas, convert it to crack cocaine, and resell it in Paris with Marco Perkins, Donnell "Scooter" Leshone Walters, and other members of the conspiracy. Wire intercepts between Edwards and Shawn Perkins recorded the two discussing money and cocaine sales, including one call in which Perkins describes the quality of crack cocaine he received from Edwards. Agents also conducted two controlled buys from Shawn Perkins: one involving 14.12 grams of powder cocaine, and another involving 9.8 grams of crack cocaine. Wiretapped calls also suggested that Marco Perkins worked to

2

distribute drugs largely at the direction of his brother Shawn Perkins. The other brother, Liggins, provided crack cocaine to Stacy Lynn Gage, a Hugo, Oklahoma, based distributor who regularly bought cocaine for redistribution from the Paris-based conspiracy.

In an indictment filed on June 11, 2009, a grand jury charged Edwards, Shawn Perkins, Akins, Gage, Marco Perkins, Andre "Dre" Deshong Dunkins, Liggins, Walters, and ten others with conspiracy to manufacture, distribute, or possess with intent to distribute 5 kilograms or more of cocaine, 50 grams or more of cocaine base, and 1000 kilograms or more of marijuana in violation of 21 U.S.C. §§ 841 and 846 (Count One). Eight defendants pleaded guilty and the charges against one were dismissed. In a superceding indictment on August 19, 2010, a grand jury charged the remaining nine defendants (the eight listed above plus Eladio Jose Leal) with the same conspiracy offense (Count One). Counts Two and Three charged Edwards with firearm offenses in connection with drug trafficking crimes in violation of 18 U.S.C. § 924(c)(1), and Count Four alleged the same against Shawn Perkins. Leal pleaded guilty to the conspiracy count on October 13, 2010.

The case went to trial on October 25, 2010, against the eight remaining defendants. Stacy Bellamy, a cooperating witness from Paris, Texas, who pleaded guilty to conspiracy to possess with the intent to distribute crack cocaine, testified that he had knowledge of the crack-distribution industry in his hometown. Bellamy testified that Edwards delivered four kilograms of powder cocaine to Shawn Perkins at Perkins' mother's house in Paris and that this happened "two or three times." Bellamy also testified that he knew Shawn Perkins and Akins to be "best friends" and that Akins helped Shawn Perkins in the crack cocaine business. Bellamy claimed to have bought crack cocaine from Shawn Perkins before starting to buy it from Akins, and that he regularly bought nine ounces of crack from Akins on credit. Another cooperating witness who pleaded guilty to conspiring to sell crack cocaine, Trentargus Holt, claimed

that at first he bought powder cocaine from Shawn Perkins and Akins before buying and reselling crack from them.

Hundreds of recordings of wiretapped phone calls between the co-conspirators were introduced at trial to support the testimony of Bellamy, Holt, and others. Although in English, the calls made heavy use of code words and vernacular and were often difficult to parse. The Government called Secret Service Agent Darrell Lyons, one of the lead investigators of this drug distribution conspiracy, as a lay witness to testify about the investigation. In the multiple times he was recalled to the stand, Lyons testified repeatedly about his understanding of the meanings of various code words used in recorded wiretapped conversations. He testified that the meanings he ascribed to those words, generally an amount or type of drug, were based on the knowledge he gained in the course of the investigation as well as his career experience. The Government also called a DEA Group Supervisor, Mark Styron, as an expert witness at trial. In addition to testifying about the role that firearms play in drug distribution organizations, Styron explained his understanding of the meanings of various code words that he claimed were commonly used in the drug distribution business.

At the close of the Government's case-in-chief, each of the defendants moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29, and all renewed the motion after resting their case. The trial judge granted Perkins' motion for judgment of acquittal concerning the firearm offense alleged in Count Four but denied all other motions.

The jury found all eight defendants guilty of Count One of the Superceding Indictment, the conspiracy charge, on November 15, 2010. By special verdict, they attributed the following drug quantities to each defendant:

> Edwards: 5 kilograms or more of cocaine, 50 grams or more of cocaine base, and less than 50 kilograms of marijuana;

Shawn Perkins: 5 kilograms or more of cocaine, less than 50 grams but more than 5 grams of cocaine base, and less than 50 kilograms of marijuana;

Akins: 5 kilograms or more of cocaine, 50 grams or more of cocaine base, and less than 50 kilograms of marijuana;

Gage: less than 500 grams of cocaine and 50 grams or more of cocaine base;

Marco Perkins: less than 500 grams of cocaine and 50 grams or more of cocaine base;

Dunkins: less than 500 grams of cocaine and less than 5 grams of cocaine base;

Liggins: 50 grams or more of cocaine base;

Walters: 50 grams or more of cocaine base.

The jury found Edwards not guilty of the two firearms offenses (Counts Two and Three).

The district court sentenced the defendants to the following prison terms for their convictions on the conspiracy charge: Edwards, 360 months; Shawn Perkins, 270 months; Akins, life imprisonment; Marco Perkins, 180 months; Gage, 360 months; Liggins, life imprisonment; Walters, 360 months; and Dunkins, 33 months. All of the defendants that went to trial, except Dunkins, now appeal.

## II.  Testimony about the Meaning of Drug Slang

This Court reviews preserved challenges to rulings on the admission of lay and expert testimony for abuse of discretion, subject to harmless error analysis.[1] We review forfeited evidentiary objections only for plain error.[2]

---

[1] *United States v. El-Mezain*, 664 F.3d 467, 511–12 (5th Cir. 2011).

[2] *United States v. Perez-Solis*, 709 F.3d 453, 462 (5th Cir. 2013).

A. Testimony of Darrel Lyons

Edwards, Akins, Shawn Perkins, and Marco Perkins challenge the district court's denial of their objection under Federal Rule of Evidence 701 to the lay testimony of Secret Service Agent Darrell Lyons concerning the meaning of code words used by the conspirators on wiretapped recordings. Because this objection was preserved at trial, at least by counsel for some appellants, we review for abuse of discretion, subject to harmless error analysis.

Lyons, the lead investigator of the conspiracy, testified as a lay witness about his understanding of the meaning of code words recorded in wiretapped conversations. Counsel objected on various grounds at trial, including that Lyons was testifying to an ultimate fact issue, that he was not qualified as an expert, and that defense counsel had not been given advance notice that he would be testifying as an expert. The district court sustained the objection on the ground that the Government had not provided defense counsel with proper notice to qualify Lyons as an expert, and prohibited Lyons from testifying on the meaning of drug slang because it required specialized knowledge.

The following day when Lyons was recalled, defense counsel renewed their objection to Lyons' continued testimony about how he interpreted coded words on wiretapped calls. The court clarified that as a lay witness under Fed. R. Evid. 701, Lyons could testify about his understanding of the meaning of coded conversations if his testimony was rationally based on Lyons' own perception–here, his reading of the wiretap transcripts and involvement in this particular investigation–and not on specialized knowledge from his broader experience. Counsel's repeated objections to Lyons' interpretations of code words on the recordings were overruled on the grounds that the interpretation was based on knowledge gathered from the investigation of this case. Lyons proceeded to give extensive testimony about what coded conversations "mean[t] to [him]" or what he "believed" the speakers were saying, and confirmed in

response to questioning that his understanding of the code words was based on his investigation of this case.

On appeal, Edwards, Akins, Marco Perkins, and Shawn Perkins urge that the district court erroneously allowed Lyons to testify as an expert on this drug jargon despite the court's earlier instruction that Lyons could testify only as a lay witness.

Although we question that the demarcation between drug slang knowledge based on Lyons' expertise and that based on his investigation of this conspiracy could have been as clean as Lyons' proffered justifications suggested, the district court did not abuse its discretion when it admitted the testimony. In *United States v. McMillan*,[3] this Court addressed the argument appellants raise here. In that case, appellants argued that the trial court "violated its role as gatekeeper for expert evidence by allowing three fact witnesses . . . to give opinions based on Louisiana's statutory accounting rules."[4] This Court denied appellants' claim, holding that the witnesses' testimony properly was confined to the conclusions and observations the witnesses gathered from their investigation in the case at issue.[5] "A witness who provides only lay testimony may give limited opinions that are based on the witness' perception and that are helpful in understanding the testimony or in determining a fact in issue, but the witness may not opine based on scientific, technical, or other specialized knowledge."[6] Although the witnesses defined certain legal terms in the course of their testimony, they provided factual information about the circumstances of the case, their observations, and the conclusions they reached. "To the extent that some of the witnesses' testimony may have implicated specialized

---

[3] 600 F.3d 434 (5th Cir. 2010).

[4] *Id.* at 455.

[5] *Id.* at 456.

[6] *Id.*

knowledge by defining certain accounting terms," this Court concluded, "the error in allowing the testimony, if any, was harmless because in the context of the entire trial [there was] no reasonable basis to find an effect on the jury's verdict."[7]

This Court has recognized that in the context of drug conspiracies, "[d]rug traffickers' jargon is a specialized body of knowledge, familiar only to those wise in the ways of the drug trade, and therefore a fit subject for expert testimony."[8] But we have not limited drug slang testimony to experts in all cases. Rather, we have recognized that testimony about the meaning of drug code words can be within the proper ambit of a lay witness with extensive involvement in the underlying investigation. In *United States v. Miranda*,[9] the appellant maintained that an FBI agent, who had not been designated as an expert witness, testified about the meanings of various code words heard on intercepted phone calls and thereby "crossed the line" from lay to expert opinion testimony. In rejecting that argument under the facts presented there, we held that the agent's testimony was permissible under Fed. R. Evid. 701 because the agent's "extensive participation in the investigation of this conspiracy, including surveillance . . . and the monitoring and translating of intercepted telephone conversations, allowed him to form opinions concerning the meaning of certain code words used in this drug ring based on his personal perceptions."[10] Similarly, in *United States v. El-Mezain*,[11] we acknowledged that some of the facts presented by testifying agents would not be known to an average lay

---

[7] *Id.* at 457.

[8] *United States v. Griffith*, 118 F.3d 318, 321 (5th Cir. 1997) (finding no error in a drug investigator's testimony on her "expertise" in drug jargon where the court and parties treated the witness "in substance as an expert" even though the court failed formally to qualify her).

[9] 248 F.3d 434 (5th Cir. 2001).

[10] *Id.* at 441.

[11] 664 F.3d at 514.

person.  But we held that the district court did not err by admitting the testimony because "the agents' opinions were limited to their personal perceptions from their investigation of this case."[12]  We noted that "[b]y explaining the meanings of terms as used in the conversations and documents, as well as the relationships between the people they were investigating, the agents provided the jury with relevant factual information about the investigation."[13]  And we clarified that "[t]estimony need not be excluded as improper lay opinion, even if some specialized knowledge on the part of the agents was required, if it was based on first-hand observations in a specific investigation."[14]

We cannot say that the district court abused its discretion in admitting Lyons' testimony.  Lyons was extensively involved in the investigation of the conspiracy.  As the lead investigator on the case, Lyons had conducted surveillance on a number of participants in the drug organization, and claimed to have reviewed every wiretapped phone call, reviewed every transcript offered into evidence, listened to "every second" of all relevant conversations, and spoken with a number of informants, co-conspirators, and the defendants themselves.  Lyons repeatedly explained how this investigation led him to deduce the meaning of drug code words.[15]  The district court was clear, to counsel and to the jury, that "as long as [Lyons'] conclusions about what the language means in the calls is based, in part, on his investigation and not rooted in his

---

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] Lyons explained, for example, that he knows "three zones" is "three ounces" because he heard the speakers on the intercepted calls use the terms interchangeably; that "kinfolk" means the defendants from Paris because he investigated where the license plates are registered; that a "nine" referred to nine ounces of cocaine because the quoted price was consistent with that amount in the investigation here; and that "we know from the search and seizure that [a "bi"] is approximately 4-1/2 ounces of crack cocaine."

9

expertise," the court would allow the testimony. Although Lyons may have drawn in part from his law enforcement experience, it was not an abuse of discretion for the district court to rule that Lyons' conclusions were largely based on first-hand observations in this specific investigation.

We hold, furthermore, that any error of the district court in admitting Lyons' testimony was harmless. To the extent that certain portions of Lyons' testimony at times crossed the line into drawing exclusively on his expertise, it was cumulative of other testimony and therefore harmless.[16] A careful review of the trial record convinces us that Lyons' interpretations overwhelmingly were consistent with those provided by Styron and by Stacy Bellamy, a cooperating co-conspirator.

Liggins, Walters, and Akins also challenge Lyons' testimony on the grounds that it was unqualified, that he testified as a summary witness, and that he gave impermissible personal "impressions" of the intercepted conversations. We hold that the trial judge did not err in accepting Lyons' personal observations of this investigation as the basis for his lay testimony. This Court has recognized that the meaning of drug code words can be within the proper ambit of the testimony of a lay witness with extensive involvement in the underlying investigation.[17]

Nor is there merit in appellants' contention that Lyons' "dual role as case agent and unqualified expert/lay opinion witness" allowed him to serve as a summary witness that impermissibly relayed his "impressions" to the jury. We are satisfied after a close review of the record that Lyons neither testified as a "summary witness" within the meaning of this Court's precedent nor served to

---

[16] *See United States v. Griffin*, 324 F.3d 330, 348 (5th Cir. 2003) ("We find any error that occurred from the district court allowing Stiner to testify as to the meaning of the law was harmless because her testimony was cumulative of other witnesses' testimony.").

[17] *United States v. Miranda*, 248 F.3d 434, 441 (5th Cir. 2001).

"merely tell the jury what result to reach." In *United States v. Nguyen*,[18] we held that the district court committed harmless error in allowing an investigator to provide a summary of her investigation along with a summary chart, testify as to the ultimate issue of the defendant's mental state by referring to her as a co-conspirator, and premise her summary testimony on out-of-court statements that had not previously been presented to the jury. While summary witnesses "may be appropriate for summarizing voluminous records, as contemplated by Rule 1006," they may not distill the jury's ultimate conclusions from a body of evidence.[19] Similarly, in *United States v. Fullwood*,[20] we held that "limits [] may well have been exceeded" (but did not rise to reversible plain error) where an agent, as a final rebuttal witness before jury deliberations, "simply recap[ped] substantial portions of the Government's case-in-chief."

Lyons did not testify as a "summary witness" within the meaning of this precedent. Lyons' interpretation of the wiretapped recordings came only after they were admitted into evidence and played before the jury. We find no point in the record at which Lyons recapped portions of the Government's case-in-chief. To the contrary, the Government called Lyons to the stand fifteen times to describe various aspects of his investigation, ensuring that his testimony came only as the evidence was presented. Lyons' explanation that his interpretation of some drug code words was based on what he learned from this investigation as a whole is a virtue for his role as a lay witness testifying from personal perception, not a vice that equates to summarizing the Government's case-in-chief within the meaning of *Nguyen* and *Fullwood*. We are satisfied that Lyons' testimony neither drew conclusions as to the significance of particular evidence in the case, nor reached ultimate legal conclusions about the appellants' guilt.

---

[18] 504 F.3d 561, 571 (5th Cir. 2007).

[19] *Id.* at 572 (quoting *United States v. Fullwood*, 342 F.3d 409, 414 (5th Cir. 2003)).

[20] 342 F.3d 409, 413–14 (5th Cir. 2003).

Rather, Lyons testified about his interpretation of coded drug slang conversations, as this Court has recognized he may do under the facts presented here.

B.  Testimony of Mark Styron

Edwards, Akins, and Marco Perkins argue that the district court erred by allowing DEA Group Supervisor Mark Styron to testify about the meaning of certain drug-code words as an expert witness under Fed. R. Evid. 702.  The basis for counsel's objection at trial to Styron's testimony was unclear, but emphasized that Styron failed to qualify as an expert on the subject of drug slang because Styron could point to no reliable sources that corroborate his interpretations of the slang words.  The court overruled the objection and denied counsel's motion to strike, finding that Styron's twenty-three years of experience as a DEA agent qualified him to testify to the meaning of drug slang. We review this preserved evidentiary objection for abuse of discretion[21] and find none.

Importantly, appellants do not argue on appeal that Styron lacks inherent expert qualification to testify regarding drug slang.  Nor do they argue that the initial Fed. R. Crim. P. 16(a)(1)(G) disclosure that Styron would be designated as an expert on drug slang is inadequate, or irrelevant because it was not filed with the court.  Rather, they point only to a Supplemental Expert Witness Notice that offered Styron as an expert on firearms, and omit reference to the initial notice that submitted Styron as an expert on drug slang, in arguing that Styron's testimony about drug slang was outside his designated area of expertise.  On April 19, 2013, the Government filed a motion to supplement the record on appeal with an Expert Witness Notice that was sent to defense counsel before trial, on October 18, 2010, but was not filed with the court at that time.  This Court granted the motion on May 1, 2013.  That Notice shows that the Government informed defense counsel, pursuant to Fed. R. Crim. Pro.

---

[21] *Perez-Solis*, 709 F.3d at 462.

16(a)(1)(G), that it would call Styron as a "Drug Distribution Expert" at trial, and specified that "based on [Group Supervisor] Styron's experience and training," he intended to testify on subjects including "slang or code terms [that] are commonly used in the narcotics underworld to help maintain the secret nature of the business" and that he "is familiar with some commonly used terms." A summary of Styron's qualifications was attached. Four days later, on October 22, 2010, the Government filed with the court, and provided to defense counsel, a "Supplemental 404B and Firearm Expert Witness Notice." That Notice stated that the prosecution would call Styron as an expert witness to testify regarding the role of guns in drug distribution, and that "Styron's qualifications have been previously provided to you." The trial record confirms that defense counsel received the initial notification that Styron would provide expert testimony about slang used in narcotics distribution, as defense counsel quoted from it in colloquy with the judge. But now on appeal, Edwards, Akins, and Marco Perkins mention only the "Supplemental Expert Witness Notice" to argue that, in testifying about the meaning of drug slang terms, Styron testified outside of his designated firearms expertise.

Fed. R. Crim. P. 16(a)(1)(G) of the provides that "[a]t the defendant's request, the government must give to the defendant a written summary of any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief at trial." Rule 16(a)(1)(G) contains no explicit requirement that the notice be filed with the court at the time it is provided to defense counsel in order for a trial judge's later designation of the witness as an expert on a topic to be valid. Because we hold that the district court committed no error in designating Styron as an expert on drug slang and defense counsel received proper notification, we find no merit in appellants' claim.

Finally, Edwards, Akins, Marco Perkins, and Walters contend that the district court violated their Sixth Amendment Confrontation Clause rights by

allowing Styron to testify about the basis for his expert opinions concerning the meaning of certain drug code words. We review "Confrontation Clause objections that were properly raised at trial [] de novo, subject to harmless error analysis."[22]

The appellants' objection here is two-fold. First, they argue that because Styron's drug-slang testimony was outside his designated area of expertise, he essentially testified as both an expert (on guns) and a lay/fact witness (on drug slang). They claim this hampered defense counsel's ability to cross-examine Styron because a failed attempt to impeach Styron as an expert could backfire to enhance his credibility as a fact witness. They point to a Second Circuit case, *United States v. Dukagjini*,[23] which raised concerns where the case agent who testified about the facts of a drug conspiracy investigation also provided expert testimony about the meaning of drug slang. There, the Second Circuit explained that while not categorically impermissible, the use of a case agent as both a fact and expert witness presents a heightened risk that the "expert testimony will stray from applying reliable methodology and convey to the jury the witness's 'sweeping conclusions' about appellants' activities," impinging on the role of the jury.[24]

But having concluded that Styron's testimony about drug slang was within his designation as an expert, we find no indication in the record that Styron testified as both an expert and a fact witness, nor that counsel's vigorous cross-examination was hampered in any way. Unlike Lyons' testimony, Styron's testimony was general information about the drug trade and law enforcement learned over a long career, not fact testimony about this investigation. Indeed, defense counsel made this distinction clear for the jury multiple times during

---

[22] *United States v. Pryor*, 483 F.3d 309, 312 (5th Cir. 2007).

[23] 326 F.3d 45, 53–54 (2d Cir. 2003).

[24] *Id.* at 54.

cross-examination, emphasizing that Styron was explaining the general process of conducting a DEA investigation but not giving specific testimony about the defendants. On review of the record we do not find Styron to have served as a fact witness, and Styron clarified multiple times that his testimony was based on his understanding of common terms used throughout the drug distribution industry–not from the facts of this investigation. The concerns raised by the Second Circuit about a case agent serving dual roles as fact witness regarding the investigation and as expert witness are thus inapplicable here, where Styron's testimony properly was confined to his areas of expertise.

Second, appellants argue that to the extent Styron explained that his expertise on the meaning of drug slang terms is based, in part, on what he heard other conspirators say in other drug investigations over the course of his career, he relayed impermissible hearsay to the jury in violation of the Confrontation Clause. Appellants urge this Court to adopt the Second Circuit's reasoning in *United States v. Mejia*,[25] which found that expert testimony violated the Confrontation Clause where the expert simply transmitted testimonial hearsay statements–there, the custodial interrogations of other gang members in the same conspiracy–without "form[ing] his own opinions by applying his extensive experience and a reliable methodology to the inadmissible materials."[26]

But we hold that *Mejia* is inapplicable to the non-testimonial bases of Styron's expert opinion presented here. Appellants point to no testimonial statements within the meaning of *Crawford v. Washington*,[27] or any impermissible hearsay at all, relayed by Styron's testimony. When asked how he came to form his opinions about the interpretation of coded drug slang, Styron explained that over the course of his career, he "listened to thousands of

---

[25] 545 F.3d 179 (2d Cir. 2008).

[26] *Id.* at 197 (quotation marks and citations omitted).

[27] 541 U.S. 36 (2004).

conversations on telephones and [was] part of hundreds of investigations," including talking to cooperating individuals and other agents in unrelated investigations, and became familiar with the common drug jargon of many organizations. Fed. R. Evid. 703 allows an expert witness to "base an opinion on facts or data in the case that the expert has been made aware of or personally observed," as well as inadmissible evidence "if experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject[.]" Styron's testimony suggests only that he based his opinion on the types of information that an agent with extensive experience investigating drug conspiracies reasonably would rely, and we hold that no Confrontation Clause violation occurred here.

### III.  Sufficiency of the Drug Conspiracy Evidence

Marco Perkins, Gage, Liggins, Walters, and Akins challenge the sufficiency of the evidence to support their convictions for conspiracy under Count 1 of the indictment.  Specifically, Marco Perkins, Gage, Liggins, and Walters challenge only the sufficiency of the evidence concerning their involvement in the conspiracy; they do not challenge the jury's drug-quantity determination.  Akins challenges the jury's finding that he was a knowing member of the conspiracy and also that he should be held responsible for five kilograms or more of powder cocaine, but he does not challenge the jury's finding that he should be held responsible for 50 grams or more of crack cocaine.

All of the defendants moved for a judgment of acquittal under Fed. R. Crim. P. 29 at the close of the Government's case-in-chief, and the court allowed them to adopt their earlier Rule 29 motion after resting.  Because the defendants "moved for a judgment of acquittal both after the government's case in chief and at the close of the trial, we review a challenge to the sufficiency of the evidence de novo, reviewing the evidence in the light most favorable to the verdict and determining whether any rational jury could have found guilt beyond a

reasonable doubt."[28]  "We do not evaluate the weight of the evidence or the credibility of the witnesses."[29]

Appellants' conspiracy conviction required proof, beyond a reasonable doubt, of the existence of an agreement to manufacture, distribute, or possess with the intent to manufacture or distribute cocaine, crack, or marijuana, as well as each appellant's knowledge of and voluntary participation in that agreement.[30]  A "jury may infer a conspiracy agreement from circumstantial evidence, and may rely upon presence and association, along with other evidence, in finding that a conspiracy existed."[31]

A.  Marco Perkins

Although much of the Government's proffered evidence with respect to Marco Perkins shows only that he had a fraternal relationship with Shawn Perkins, sufficient evidence supports the jury's finding that the relationship was one between co-conspirators as well.  The jury heard several recorded wiretapped calls that support an inference that Marco Perkins was part of a drug distribution business, at least with his brother Shawn Perkins and with Akins.  On a call between Shawn Perkins and Akins on December 13, 2008, Akins said, "I'm right at four now.  I don't know what Marco and them did."  On another call between Shawn Perkins and Akins that same day, Akins said:

> I mean I'm like this, like 40, like 41.  Marco and them, they got something they've been working today, so they've probably got like five or six hundred.  Scooter, I mean, the four is part of the eight that Scooter owe me.  He said just hit him and he'll have it . . . Like I said, 41 with the eight that Scooter owe and – and Marco and them, shoot, they got like 20 of them yards. So then I got like two flippers left . . . .

---

[28] *United States v. Hale*, 685 F.3d 522, 543 (5th Cir. 2012).

[29] *United States v. Solis*, 299 F.3d 420, 445 (5th Cir. 2002).

[30] *See, e.g.*, *Perez-Solis*, 709 F.3d at 461.

[31] *Id.*

The two mentioned Marco again on a call the following day, in which Akins said to Shawn Perkins, "How many – how much more Marco over there? Huh?," and then they talk about four or five yards. Two days later, on December 16, Shawn Perkins received a text message from an unknown person saying, "Yall need to fire marco I sware I need three yards aint seem him yet I been waiting since three thirty just tell him to holla[.]" That same day, in a call between Marco Perkins and his brother Shawn, Marco told Shawn, "I can't got no access to no hard either," and that "I got five little, JJ want one and Red want two, hell I might break them other two down." The next day, Shawn asked Marco, "How much bread you got?" to which Marco responded, "Seven."

From these and other similar calls, the jury reasonably could infer that Marco Perkins was actively involved in a drug distribution conspiracy with Shawn Perkins, Kendrick Akins, and perhaps others. There is no basis to disrupt the jury's finding.

B. Stacy Lynn Gage

Gage argues that he was a mere buyer and seller of drugs, not linked in a conspiracy relationship to his co-defendants. "[W]hile it is true that a buyer-seller relationship, without more, will not prove a conspiracy, . . . [o]ne becomes a member of a drug conspiracy if he knowingly participates in a plan to distribute drugs, whether by buying, selling or otherwise."[32] The evidence shows Gage purchased drugs from the Paris network regularly and in distribution quantities. Under the facts presented in the record here, it is reasonable for the jury to infer a voluntary and knowing agreement between them to violate the narcotics laws. Gage, who lived in Hugo, Oklahoma, repeatedly purchased cocaine in Paris, Texas, in quantities large enough for redistribution. On a wiretap phone recording between Gage and Shawn Perkins

---

[32] *United States v. Delgado*, 672 F.3d 320, 333 (5th Cir. 2012) (en banc) (emphasis omitted) (quoting *United States v. Maseratti*, 1 F.3d 330, 336 (5th Cir. 1993)).

on December 10, 2008, Gage complained that what Perkins sold him was short, at only 78 grams instead of 126, before Gage concluded there was something wrong with his scale. The Government also presented a series of text messages between Shawn Perkins and a phone subscribed to Angela Melton, Gage's girlfriend, on December 15 to 21, 2008, discussing and coordinating a series of drug transactions in which Gage agreed to purchase drugs from Perkins. Stacy Bellamy, a cooperating witness, testified that he saw Liggins selling "nine to 13 ounces" of crack cocaine to Gage. Another Paris crack dealer and cooperating witness facing conspiracy charges in another case, Terrence Miles, also testified that he sold Gage crack cocaine weekly. Sufficient evidence supports Gage's conviction here.

C.  Clovis Shantez Liggins

Liggins urges that the evidence fails to show he was a part of, or even knew of, a larger drug distribution conspiracy and at most only establishes that he tangentially assisted his brother Shawn Perkins. Only a few of the hundreds of calls played for the jury involve Liggins, but we hold that these reasonably give rise to an inference of his participation in the drug distribution conspiracy.

On a wiretapped call on November 26, 2008, Shawn Perkins directed Liggins to go over to [co-defendant Andre Dunkins's location] and get "that three hundred he owe me," and Liggins agreed. Perkins then called Dunkins to tell him that "that nigger, Black, fixin' come through there." On December 1, 2008, Liggins told Shawn Perkins that "Little Earl" wanted a "quarter" and that he "told them about 250," to which Perkins replied, "Yeah, I'll just give it for 225 and you can go ahead and make that 25." In a wiretap conversation on January 9, 2009, Liggins asked Shawn Perkins: "Hey whatchu do with my work fool?" and Perkins responded that he had left it on the living room table. Later that day a female called Perkins from Perkins' mother's house on Campbell Street, and Perkins directs the female to a table for something and told her to "hide it somewhere real good."

Additionally, cooperating witness James Liggins testified that he bought cocaine or crack from Shantez Liggins most weeks, and that he had asked Shantez to sell him drugs on credit, but Shantez said James would have to "speak to his brother to see would that be all right." Cooperating witness Terrence Miles, a Paris crack dealer, testified that Shantez worked with "his brother, um, Marco and Shawn" in the crack business. The jury's inference from this evidence that Liggins was a knowing member of the drug distribution conspiracy is not unreasonable.

D. Donnell Leshone Walters

The evidence also is sufficient to support Walters' conspiracy conviction. A wiretapped phone call on December 13, 2008, captured Walters complaining to Perkins that the crack cocaine he had gotten from Perkins was of lower quality than in the past, and that this was causing problems with Walters' customers. That same day, in a call between Akins and Shawn Perkins, Akins complained that he was waiting on Walters, also known as "Scooter," to pay him some money he owed him. Previously, on December 1, Shawn Perkins and Akins had a call accounting for outstanding drugs and debts, and mentioned that "Scooter still owe me the eight."

Stacy Bellamy, a cooperating witness, testified that he would sell Walters "anywhere from an ounce to two ounces of crack" once a week in the summer of 2007, and that this quantity was consistent with the buyer being a dealer. From this and other evidence presented at trial, the jury reasonably could conclude that Walters was a knowing member of the drug distribution conspiracy here.

E. Kendrick Tyshawn Akins

Akins challenges the sufficiency of the evidence supporting the jury's finding both that he was a knowing member of the conspiracy and that he is responsible for five kilograms or more of powder cocaine. He does not challenge the jury's finding that he is responsible for 50 grams or more of crack cocaine.

Evidence from wiretapped calls supports the jury's determination that Akins was a member of the conspiracy. The calls are too numerous to list here. As an example, Akins and Shawn Perkins accounted for drugs and money on an intercepted call on December 1, 2008. Akins asked Shawn Perkins, "How much of that work you got left?" and Perkins replied, "About almost three ounces. Two ounces for sure. Something like that." Perkins asked, "You want me to split that up? If you're gonna come back Tuesday, you can probably just leave Marco some or something." Akins asked, "I'm saying do I need to do that other one?" and Perkins replied, "[Expletive] no, I don't think there's gonna be till Monday or Tuesday." In another example, on December 9, Perkins told Edwards that he was "gonna send Kendrick [Akins]" over and directed Edwards to "hand him two of mine." Shortly before Akins returned with the drugs, he said, "he gave me a biat though–I can't really tell what yours is–yours looks like it may be a nine." The record shows many similar calls, and sufficiently supports the jury's conviction.

Akins also argues that the evidence does not support the jury's finding that he is responsible for five kilograms or more of powder cocaine. The jury found Akins, along with his co-defendants, guilty of Count 1 of the Superseding Indictment, which charged a conspiracy to manufacture or distribute or intent to manufacture or distribute 5 kilograms or more of cocaine, 50 grams or more of crack cocaine, and 1000 kilograms or more of marijuana. Then, pursuant to a special verdict form, the jury was instructed to "determine the quantity of cocaine, cocaine base (crack) and/or marijuana attributable to each defendant found guilty of Count One." The jury determined that Akins was responsible for five kilograms or more of cocaine, 50 grams or more of crack, and less than 50 kilograms of marijuana.

The Government's burden at trial was to prove the existence of a conspiracy, Akin's involvement in it, and the requisite drug quantity involved in

the conspiracy beyond a reasonable doubt.[33] This Court has explained that even post-*Apprendi*,[34] the burden does not extend to the "individualized question of what drug quantity was attributable" to a particular defendant as a co-conspirator.[35] The Government "need only allege and prove to the jury the bare facts necessary to increase the statutory sentencing maximum *for the conspiracy as a whole*."[36] Of course, a "defendant will not necessarily be held responsible for the full amount of drugs involved in the conspiracy," but rather only "those amounts of drugs that he knew or reasonably could have known or believed were involved in the conspiracy," considering "the co-conspirator's role in the conspiracy, his relationship to the other conspirators, and any other information with 'sufficient indicia of reliability.'"[37]

Here, the jury determined that the conspiracy as a whole involved more than five kilograms of powder cocaine, and confirmed via the special verdict form that Akins is responsible for this entire amount as a member of the conspiracy. The substantial evidence showing Akins' active and knowing role in the conspiracy leaves us no reason to disrupt this determination. That the evidence shows Akins's direct dealings focused on crack cocaine[38] does not, in light of his substantial role in the conspiracy and his relationship to the other co-

---

[33] *See United States v. Turner*, 319 F.3d 716, 721 (5th Cir. 2003).

[34] *Apprendi v. New Jersey*, 530 U.S. 466 (2000).

[35] *See Turner*, 319 F.3d at 722.

[36] *Id.* (quoting *Derman v. United States*, 298 F.3d 34, 42–43 (1st Cir. 2002)).

[37] *United States v. Brito*, 136 F.3d 397, 415 (5th Cir. 1998) (quoting *United States v. Puig-Infante*, 19 F.3d 929, 942 (5th Cir. 1994)).

[38] Evidence also indicated that Akins had at least some direct dealings in powder cocaine as part of the drug distribution conspiracy. Trentargus Holt, a cocaine dealer and cooperating witness, testified that he bought half an ounce to an ounce of powder cocaine a couple of time per week from Akins from the early part of 2006 to that summer.

conspirators, absolve him of responsibility for the conspiracy's foreseeable distribution of powder cocaine.

## IV. Severance

For the first time on appeal, Gage contends that he was deprived of a fair trial because he was tried together with co-defendants against whom the evidence was more extensive. Fed. R. Crim. P. 12(b)(3)(D) requires that a Rule 14 motion to sever charges or defendants be raised before trial. Rule 12(e) goes on to explain that a party "waives any rule 12(b)(3) defense, objection, or request not raised" by the pretrial motions deadline set by the court unless the court grants relief from the waiver for good cause. Our precedent is clear that "where an appellant failed to move to sever before trial as Federal Rule of Criminal Procedure 12(b) requires, he waive[s] his severance argument on appeal."[39] This Court has also held that where "appellants have failed to show any cause for failing to move for severance prior to trial, we need not even address the merits of their argument."[40]

Gage neither moved for severance before trial as Rule 12(b) requires, nor offers any cause for the lack of a timely motion. We must conclude that Gage waived his severance argument.

## V. Denial of Motion for Continuance

---

[39] *United States v. Cantu-Ramirez*, 669 F.3d 619, 624 (5th Cir. 2012) (citing *United States v. Bernegger*, 661 F.3d 232, 236–37 (5th Cir. 2011) (per curiam)).

[40] *United States v. Mann*, 161 F.3d 840, 862 (5th Cir. 1998). *Mann* goes on to explain that *United States v. Tolliver*, 61 F.3d 1189, 1199 n.6 (5th Cir. 1995), vacated and remanded on other grounds, 516 U.S. 1105 (1996), notes that "failure to move for severance prior to trial might leave room for review under the plain error standard of review," and that "other cases have reviewed the district court's failure to sever for plain error where there was no objection," including *United States v. Misher*, 99 F.3d 664, 669 (5th Cir. 1996), and *United States v. Carreon*, 11 F.3d 1225, 1240 (5th Cir. 1994). But even if the Court were to apply plain error review here, Gage's claim–that the more extensive evidence against his co-defendants prejudiced the jury against him–falls short of showing that the error was "clear or obvious" and that it "seriously affect[ed] the fairness, integrity, or public reputation" of his trial. *Misher*, 99 F.3d at 669.

Akins argues that he was prejudiced by the district court's denial of a motion for continuance because the complexity of the case and the short time his counsel had in which to prepare for trial affected his ability to prepare an adequate defense. "This court will reverse a district court's decision denying a defendant's motion for continuance only when the district court has abused its discretion and the defendant can establish that he has suffered serious prejudice."[41]

Mr. D'Angelo, Akins' current counsel, was appointed on September 9, 2010, which was 46 days before the start of the trial. Akins had two attorneys before Mr. D'Angelo was appointed; one was permitted to withdraw due to a conflict of interest, and the one before him was discharged by the court on March 2, 2010, on Akins' request.

Mr. D'Angelo moved for a continuance on September 27, 2010, which the Government opposed due to the age of the case and the number of in-custody defendants awaiting trial. In its order of September 28, 2010, denying Akins' motion to continue, the district court stated that its "calendar is such that any continuance would require resetting the trial sometime in mid-2011." On the first day of trial, Mr. D'Angelo reurged his motion to continue. The court denied it for the same reasons stated in its order. The court did, however, grant Mr. D'Angelo's motion to adopt certain pre-trial motions filed by other defendants, in recognition that Mr. D'Angelo had been "hurrying to get up to speed."

Akins argues that because Mr. D'Angelo was appointed only 46 days before trial in a complex case and had difficulty obtaining and reviewing the audio discovery in this case, he did not have adequate time to prepare for trial. When a party complains of inadequate preparation time, this Court considers "(1) the amount of preparation time available, (2) whether the defendant took advantage of the time available, (3) the likelihood of prejudice from a denial, (4) the

---

[41] *United States v. Castro*, 15 F.3d 417, 432 (5th Cir. 1994).

availability of discovery from the prosecution, and (5) the complexity of the case."[42]  Here, the case was designated as complex, and counsel's preparation time was limited.  But "[t]he grant or denial of a continuance is within the sound discretion of the trial court,"[43] and we find no abuse of that discretion here.  Mr. D'Angelo had the benefit of both co-defendants with independent counsel and of the Government, which cooperated in providing discovery.  Moreover, Mr. D'Angelo actively represented his client at trial and vigorously cross-examined the witnesses against him.  We hold that these circumstances do not rise to the level of serious prejudice that would demonstrate the district court abused its discretion.[44]

## VI.  Sentencing Issues

### A.  Edwards' Sentencing Enhancements

Edwards argues that the district court erred by assigning him an aggravating-role sentencing enhancement under U.S.S.G. § 3B1.1(b) based on its finding that Edwards was a manager or supervisor in the conspiracy.  We review a district court's factual finding that a defendant was a manager or supervisor under U.S.S.G. § 3B1.1(b) for clear error[45] and "deem the district court's factual findings clearly erroneous only if, based on the entire evidence, [we are] left with the definite and firm conviction that a mistake has been

---

[42] *United States v. Lewis*, 476 F.3d 369, 387 (5th Cir. 2007).

[43] *United States v. Kelly*, 973 F.2d 1145, 1147 (5th Cir. 1992).

[44] *See Lewis*, 476 F.3d at 387 (no abuse of discretion in a complex case with ten defendants and voluminous discovery where counsel was appointed ten days before trial because, although the length of time was "excessively short," counsel provided effective representation at trial and benefitted from the arguments of co-defendant's counsel).

[45] *United States v. Rose*, 449 F.3d 627, 633 (5th Cir. 2006).

committed."[46]  "A factual finding is not clearly erroneous if it is plausible in light of the record read as a whole."[47]

Edwards was sentenced to 360 months imprisonment for his conviction on the conspiracy count.  Section 3B1.1(b) authorizes a three-level increase to the defendant's offense level if the "defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive."  The commentary to that section notes that even if a defendant was not a manager or supervisor, the enhancement may be warranted if the defendant "exercised management responsibility over the property, assets, or activities of a criminal organization."[48]  Although the presentence report ("PSR") found no aggravating or mitigating adjustments applied to Edwards' role in the conspiracy, at sentencing the Government objected to the absence of a leadership-role adjustment under U.S.S.G. 3B1.1(b) for what it claimed was Edwards' role in supervising Antwan Price, another co-conspirator.

We cannot say it was clear error for the district court to have applied this sentencing enhancement.  The court noted that an intercepted call recorded Price asking, "What are we doing these at, 25?," Edwards responding, "What did he give you, 25?," Price responding, "Yes, he was trying to, but he was five short," and Edwards saying that "Shawn needs a couple of hos."  Another phone call between Edwards and Price recorded Edwards telling Price that "Trey is gonna slide through here and grab one of those things.  Give him one of them deals."  The district court also identified several conversations where Price and Edwards discussed quantities and prices, and one in which Edwards told a customer to take the money for a transaction to Price.  In another, Edwards told

---

[46] *Id.* (quotation marks omitted).

[47] *Id.*

[48] U.S.S.G. § 3B1.1(b) n.2.

a customer that he can get drugs at Price's apartment and the customer said, "All right. Well, let [Price] know, 'cause, you know, [Price], he don't even want to give it to you unless you let him know," to which Edwards replied, "I'll hit him, though." Finally, the evidence showed two calls in which Edwards and Price discussed remaining quantities of drugs and Edwards told Price to "Just hold that one. That one gone too."

The district court concluded from this evidence that "there does appear to be evidence of planning and a degree of control and authority exercised by Edwards over Price, where Price is reporting to Edwards how much Price has as far as drugs, and Edwards is instructing Price on what to do with the drugs." We conclude that the district court did not commit clear error in applying the sentencing enhancement for a managerial or supervisor role on these facts.

Edwards next contends that the district court erred by enhancing his sentence by two levels for firearm possession under U.S.S.G. § 2D1.1(b)(1). The decision whether to impose this firearm enhancement is a factual determination that we review for clear error.[49]

The district court applied a two-level increase to Edwards' Guidelines range pursuant to U.S.S.G. § 2D1.1(b)(1) for possession of a firearm. That section provides for a two-level enhancement if a characteristic of the underlying offense is that a "dangerous weapon (including a firearm) was possessed." Specifically, the increase related to a loaded .30 caliber semiautomatic pistol that was seized from underneath the mattress where Edwards and his girlfriend slept at the girlfriend's residence. Small amounts of crack (6.3 grams), heroin (0.38 grams), and marijuana (4.5 grams) were also recovered during that search. Counts 2 and 3 of the Superceding Indictment charged Edwards with using or possessing a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1). The jury acquitted him on both firearms counts.

---

[49] *United States v. Chavez*, 119 F.3d 342, 348 (5th Cir. 1997).

That the evidence did not rise to the level of showing Edwards actively employed the weapon in furtherance of the drug crime (as per the jury's verdict of acquittal on this charge) does not preclude the judge's finding that it met the lower standard of U.S.S.G. § 2D1.1(b)(1). The application notes to 2D1.1(b)(1) direct that the enhancement "should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense," to reflect "the increased danger of violence when drug traffickers possess weapons."[50] We find no error in the district court's determination that, because the evidence showed Edwards knew the weapon was under the mattress on his side of the bed in a room where drugs were found and explained to his girlfriend how to use the weapon, it was not clearly improbable that it was connected to the drug offense.

B.  Gage's Career Offender Enhancement

We review a district court's determination that a defendant is a career offender under U.S.S.G. § 4B1.1 *de novo*.[51] Gage contends that the district court erred in applying a career-offender enhancement under U.S.S.G. § 4B1.1(a) because he argues that his two prior felony convictions were related and should have counted as a single prior conviction for sentencing enhancement purposes. A career-offender enhancement applies under U.S.S.G. § 4B1.1(a) if, among other things, "the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense." The Guidelines instruct that "[p]rior sentences always are counted separately if the sentences were imposed for offenses that were separated by an intervening arrest (i.e., the defendant is arrested for the first offense prior to committing the second offense)."[52]

---

[50]  U.S.S.G. § 2D1.1(b)(1), application note 11(A).

[51] *United States v. Brewster*, 137 F.3d 853, 858 (5th Cir. 1998).

[52] U.S.S.G. § 4A1.2(a)(2).

The district court sentenced Gage as a career offender under U.S.S.G. § 4B1.1(a) based on Gage's two prior convictions: one, for an arrest on April 27, 2003, for Possession of a Controlled Substance with Intent to Deliver, and two, on May 27, 2003, for Delivery of a Controlled Substance. Gage was sentenced for both these offenses on the same day, November 11, 2003. Although he acknowledges that the offenses were separated by an intervening arrest, Gage argues that the Court nevertheless should treat them as related because they both occurred within a month of each other in the same town and the second offense (delivery) was the completion of the conduct underlying the first offense (possession with intent to deliver). But Gage points to no in-circuit authority that suggests the district court should overlook the clear language of U.S.S.G. § 4A1.2(a)(2) on these grounds, and we decline to do so here. Accordingly, we hold that the calculation of Gage's sentence under § 4B1.1(a) and § 4A1.2(a)(2) was proper.

C. Drug Quantities and *Booker*

It is well established that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt" because it is, by definition, an element of the offense.[53] Likewise, as the Supreme Court held in *Alleyne v. United States*,[54] any fact that increases the mandatory minimum is an element and must be submitted to the jury. After *Alleyne* and its predecessor *Blakely*,[55] then, both a defendant's mandatory minimum and maximum sentence must be determined according to the drug quantity found by a jury. "For a defendant involved in a drug trafficking

---

[53] *Apprendi v. New Jersey*, 530 U.S. 465, 490 (2000); *see also Alleyne v. United States*, 133 S. Ct. 2151, 2158 (2013).

[54] 133 S. Ct. 1251, 1258 (2013).

[55] *Blakely v. Washington*, 542 U.S. 296, 303 (2004).

conspiracy, the quantity includes both the drugs with which the defendant was directly involved and the drugs that can be attributed to him through the conspiracy."[56]  "'[O]nce the jury has determined that the conspiracy involved a type and quantity of drugs sufficient to justify a sentence above the default statutory maximum and has found a particular defendant guilty of participation in the conspiracy, the judge lawfully may determine the drug quantity attributable to that defendant and sentence him accordingly.'"[57]

### I. Akins

By special verdict, the jury attributed to Akins five kilograms or more of cocaine, 50 grams or more of cocaine base, and less than 50 grams of marijuana. 21 U.S.C. § 841(b)(1)(A) provides that a violation involving 5 kilograms or more of cocaine, or 280 grams or more of crack, is subject to a statutory punishment of ten years to life imprisonment.  Where a person commits a violation of this section after two or more prior convictions for felony drug offenses, the offender "shall be sentenced to a mandatory term of life imprisonment without release."[58] Section 841(b)(1)(B), on the other hand, provides for a minimum term of ten years and a maximum term of life imprisonment for a violation involving 28 grams or more of crack for a defendant with prior convictions for felony drug offenses.

The Government filed an Information of Sentence Enhancement which indicated that it sought to enhance Akins' sentence pursuant to 21 U.S.C. § 841 and § 851 based on two felony convictions for "Manufacture/Delivery Controlled Substance," committed on December 17, 1998 and December 18, 1999.

---

[56] *Brito*, 136 F.3d at 415 (citing *United States v. Puig-Infante*, 19 F.3d 929, 942 (5th Cir.1994)); U.S.S.G. § 1B1.3(a)(1).

[57] *United States v. Turner*, 319 F.3d 716, 722 (5th Cir. 2003) (quoting *Derman v. United States*, 298 F.3d 34, 42–43 (1st Cir. 2002)).

[58] *Id.*

Here, the jury's finding that Akins was responsible for five kilograms or more of powder cocaine, together with Akins' two prior convictions, makes him eligible for a mandatory life sentence without parole under § 841(b)(1)(A). Nevertheless, Akins argues that the sentencing judge set aside the jury's finding that Akins was responsible for five kilograms of powder cocaine and instead sentenced Akins in accordance with the judge's own finding that Akins was responsible for 280 grams or more of crack cocaine, which was in excess of the jury's attribution of 50 grams of crack cocaine to both Akins and the conspiracy as a whole and which triggered a higher mandatory sentence, in violation of *Booker*. We agree with Akins that the sentencing judge was in error insofar as he looked to a crack cocaine calculation that was in excess of the jury's finding and that would trigger a higher sentence than the quantity found by the jury–in this case, the higher mandatory life sentence triggered by 280 grams of crack cocaine rather than the ten years to life sentence that accompanies 50 grams for a repeat offender. But we are not persuaded after a careful reading of the sentencing transcript that the sentencing judge set aside or otherwise disregarded the jury's finding that Akins was responsible for five kilograms or more of crack cocaine. Although the judge looked to the evidence supporting Akins' involvement with crack cocaine pursuant to defense counsel's "assertion that there's absolutely no evidence to support . . . five kilograms of powder cocaine being attributed to Mr. Akins," the judge never found the jury's special verdict regarding powder cocaine to be unsupported by the evidence at trial. And any error committed by the sentencing judge in looking to the higher crack cocaine calculation of 280 grams is harmless under the scenario here, where the same mandatory life sentence applies to Akins pursuant to the jury's finding that Akins and the conspiracy as a whole is responsible for five kilograms or more of powder cocaine. Having previously rejected Akins' argument that he cannot be held responsible for the five kilograms or more of powder cocaine

31

distributed by the conspiracy as a whole, we affirm the district court's sentence.

ii.  Marco Perkins

Marco Perkins argues that the sentencing judge violated *United States v. Booker*[59] because in calculating the Guidelines range, the judge accepted the PSR's finding that Marco Perkins was responsible for more than 300 grams of crack cocaine–an amount in excess of the jury's finding, by special verdict, that Perkins was responsible for less than 500 grams of powder cocaine and 50 grams or more of crack cocaine.  Based on the facts found by the jury and Marco Perkins' career criminal enhancement, the statutory minimum and maximum sentence under § 841(b)(1)(B) for 28 grams or more of crack cocaine is ten years to life.  The sentencing judge adopted the facts set forth in the PSR and, based on total offense level and criminal history, found the Guidelines range in accordance with the Fair Sentencing Act to be 168 to 210 months incarceration. Marco Perkins was sentenced to 180 months.

No error under the *Booker* line of cases occurred here.  The judge's finding that Marco Perkins was responsible for more than 300 grams of crack cocaine did not increase the maximum or the minimum penalty to which Perkins could be subjected based on the jury's findings and Perkins' prior convictions, as required for a violation of either *Apprendi* or *Alleyne*.  The judge simply calculated an intermediate advisory Guidelines range based on his own findings, as permitted by *Booker* and its progeny.  These findings, moreover, were supported by the evidence and not clearly erroneous, and we hold there is no basis for overturning them here.[60]

VII.  Prior Felony Drug Convictions

---

[59] 543 U.S. 220 (2005).

[60] *Cantu-Ramirez,* 669 F.3d at 629 (explaining the standard of review).

Finally, Akins argues that the district court violated *Apprendi*[61] by increasing his maximum sentence based on his two prior felony drug convictions. Specifically, Akins claims that enhancing his sentence to a mandatory term of life imprisonment based on his two prior convictions, both for Possession with Intent to Deliver a Controlled Substance within a School Zone, violated *Apprendi* and the Sixth Amendment by not being pleaded in the Superseding Indictment and determined by a jury. Akins admits that at least where the recidivist issue is not contested, as here, the fact of prior conviction is a sentencing factor that need not be submitted to a jury.[62] Akins' argument is foreclosed by Supreme Court precedent and we do not revisit it here.

VIII.

We affirm.

---

[61] *See Apprendi*, 530 U.S. 466.

[62] *Id.* at 489–90 (discussing *Almendarez-Torres v. United States*, 523 U.S. 224 (1998)).